# REPORTS

OF

# CASES ARGUED AND DETERMINED

## At January Term, 1859.

————— ◦◦◦◦◦ —————

## BELCHER AND WIFE *vs.* SANDERS.

[BILL IN EQUITY TO ESTABLISH IMPLIED TRUST.]

1. *Trust implied and enforced against self-constituted agent and guardian.*—Where the defendant undertook to become the guardian of his infant sister-in-law, and to bid in for her, at the sale of the personal property belonging to the estate of her deceased father, certain slaves to which she had a family attachment; and, in pursuance of his promise, but before taking out letters of guardianship, bought the slaves at the sale, professedly for the infant, and thereby obtained them at an inadequate price,—*held,* that these facts establish a trust, at the election of the infant, which a court of equity will enforce in her favor.

APPEAL from the Chancery Court of Perry.

Heard before the Hon. JAMES B. CLARK.

THE bill in this case was filed by John Belcher and Susan, his wife, against Green B. Sanders; and sought to establish and enforce an implied trust, in favor of Mrs. Belcher, in certain slaves which the defendant had purchased at the sale of the personal property belonging to the estate of Lewis Abbott, deceased, who was the father of Mrs. Belcher, and the father-in-law of the defendant. The facts stated in the bill, as the ground of the relief prayed, are substantially as follows:

The complainants were married, in Perry county, Alabama, on the 18th December, 1856, when the complainant Susan was only about seventeen years of age. Lewis Abbott, her father, died in February, 1848, intestate, leaving a widow and fifteen children; five of his sons being at that time over twenty-one years of age. Mrs. Belcher lost her mother in infancy, and was consequently placed under the charge of a negro woman named Lizzy, belonging to her father, by whom she was nursed and tended with affectionate care. The two children of Lizzy, Martha and Amanda by name, thus became the playmates and companions of their young mistress, who conceived a strong attachment towards them and their mother. Her father, observing this attachment, declared that the two negro girls should belong to his said daughter, and should never be separated from her. In accordance with these declarations, he executed two wills, one in 1845, and the other in 1847, (neither of which could be found after his death,) in which he bequeathed said negroes to her; and the "negroes were known and called in the family as belonging to her." The defendant had married an elder sister of Mrs. Belcher, "a number of years before the death of their said father," and resided a few miles distant from him; "and said defendant well knew the wishes and intentions of her said father as above stated, and that said Martha and Amanda were known and called in the family as belonging to her."

The defendant, perceiving the anxiety of said Abbott about the welfare of his infant daughter Susan, or from some other cause unknown to the complainants, promised said Abbott that, in the event of the latter's death, he would raise and educate said Susan, free of charge; "and after the death of her father, it was understood by the defendant, and in the family of her deceased father, that the defendant was to become the guardian of the complainant Susan; and said defendant promised and agreed with her brothers, Daniel and George Abbott, that he would raise and educate her without charge; and this was known to her said brothers, before and at the time of the sale hereinafter mentioned." "Afterwards, to-wit,

Belcher and Wife v. Sanders.

on the 3d day of January, 1848, the defendant became the guardian of the complainant Susan, by regular appointment from the probate court of said county, and has ever since so continued to be."

On the 18th December, 1848, the administrator of said Abbott, obtained an order from the probate court for the sale of the personal property belonging to said estate; and proceeded to sell said property, under said order, on the 19th January, 1849. "Before said sale, said defendant agreed with said Daniel and George Abbott that, at said sale, he would buy said negroes Martha and Amanda for the complainant Susan, and would pay for them with her money; and declared before the said sale, in the presence and hearing of her brother Benjamin and others, that he was going to buy said negroes for her; and this intention of said defendant was generally known among the members of the family, especially among the complainant's older brothers, and, perhaps, to many others attending said sale; and when the said negroes were put up at the sale, it was understood that the defendant was to become the guardian of complainant Susan. The complainant's said brothers, knowing the circumstances beforementioned, and wishing that the intentions of their father should be carried out, were willing and desirous that said defendant should buy said negroes for her, and agreed with said defendant that he should buy them for her accordingly; and for like reasons the said administrator, and perhaps others, were unwilling to interpose. Therefore, when said negroes were put up for sale, at the time aforesaid, they were bid off by said defendant, at the sum of $390 for Martha, and 400 for Amanda; sums below what said negroes would have brought, as complainants believe, but for the circumstances aforesaid. The said George and Daniel Abbott were present at said sale, and were ready, able and willing to bid off said negroes for said complainant, as was known to said defendant, and did not do so because of said understanding then existing between them and said defendant."

The defendant did not pay any money to the administrator on account of the purchase of said slaves, but, on

subsequent settlement between them, deducted from the distributive shares of his wife and ward the amount due on account of his purchase of said slaves and other property at the sale. On divers occasions after the sale, and in the presence of many different persons, he admitted that he had bought said slaves for the complainant, and had paid for them with her funds. The negroes have greatly increased in value, and are worth about $2500. The defendant now refuses to deliver them to the complainants, and claims to hold them as his own property; and he has filed his accounts and vouchers for a settlement of his said guardianship, charging himself therein with the amount paid on the purchase of said slaves and interest.

The prayer of the bill was for the delivery of the negroes, an account of their hire, and general relief.

The chancellor sustained a demurrer to the bill, for want of equity; and his decree is now assigned as error.

I. W. GARROTT, for the appellants.—The case made by the bill is this: The defendant was the guardian of Mrs. Belcher, and undertook to purchase the slaves for her; before the sale he declared his intention to purchase them for her, and agreed with her brothers that he would do so; it was understood at the sale that such was his intention and purpose, and he was thereby enabled to bid them off at a less price than he would otherwise have been obliged to pay; he afterwards paid for them with her money, and repeatedly declared that he had bought them for her, and that they belonged to her. These facts established a clear case for equitable relief.—Mosely v. Lane, 27 Ala. 62; Montgomery v. Givhan, 24 Ala. 568; 2 My. & K. 664; Kyle v. Barnett, 17 Ala. 306; 2 Johns. Ch. 62; 1 Story's Equity, §§ 465, 468, 623; 5 Dana, 224; 8 Paige, 89; 2 Hill's Ch. 567; 2 Story's Eq. §§ 1210–12. Even if the defendant had not been appointed guardian at the time of the sale, yet, having assumed to act as guardian for her, he will be held to as strict an account as if he had been duly appointed.—4 Paige, 64; 5 B. Monroe, 362; Bibb v. McKinley, 9 Porter, 636.

WM. M. BROOKS, and JNO. F. VARY, *contra.*—The bill shows on its face that the date of the defendant's appointment as guardian is incorrectly stated, and that he was not in fact the complainant's guardian when he purchased the slaves; nor did he then occupy any other fiduciary relation towards her, or have any of her funds or property in his possession, or under his control. On the contrary, he made the purchase in his own name, and on his own credit; and, on subsequent settlement with the administrator, allowed him a credit for the amount of all the property bought at the sale on the distributive shares of his wife and ward. The payment of the money of the *cestui que trust,* before or at the time of the consummation of the purchase, is the foundation of a resulting trust. Botsford v. Burr, 2 John. Ch. 404; Steere v. Steere, 5 Johns. Ch. 19; Moore v. Jackson, 6 Cowen, 725; Taliafero v. Taliafero, 6 Ala. 404; Foster v. Trustees, &c., 3 Ala. 302; White & Tudor's Leading Cases in Equity, 176–7, and authorities cited.

RICE, C. J.—"It is a settled principle of equity, that where a person undertakes to act as an agent for another, he cannot be permitted to deal in the matter of that agency upon his own account, and for his own benefit; and if he takes a conveyance in his own name of an estate which he undertakes to obtain for another, he will, in equity, be considered as holding it in trust for his principal." The agent for an infant child, although he may be but the self-constituted agent, "cannot be permitted to take to himself the entire property acquired by his agency, without liability to account for it. When he assumed the agency, he assumed its duties and responsibilities." Where he assumes to act as the agent and protector of the rights of an infant, and, in that character, obtains property professedly for it, and for a less price than he otherwise would have had to pay for the property, he will be considered as holding the property in trust for the infant; subject to his reimbursement for any expenses actually incurred in obtaining the title, and, perhaps, to other equitable allowances.—Sweet v. Jacocks, 6 Paige,

355; Mosely v. Lane, 27 Ala. 62, and authorities there cited.

Upon the facts stated in the bill, the claim of Mrs. Belcher to the negroes is not strictly and technically a resulting trust; but it has in it the substantial equity of such a trust, and belongs to what Chancellor Kent calls "that mysterious class of trusts arising or resulting by implication of law," which the legislature have left undefined and untouched, and which are forced upon the conscience by the manifest justice of the case. The retention of the negroes by the defendant, (if the allegations of the bill are true,) under a claim that they belong to him, is a fraud, against which a court of equity, not only has the power, but is bound to relieve, in order to prevent the grossest injustice. See the authorities cited in Mosely v. Lane, *supra*.

The chancellor erred in sustaining the demurrer to the bill, and dismissing it for want of equity. His decree is reversed, and the cause remanded.

NOTE BY REPORTER.—On a subsequent day of the term, (February 5th,) in response to an application by the appellee's counsel for a rehearing, the following opinion was delivered:

*Per curiam.*—We have carefully considered the petition for a rehearing in this case, and are unanimous in the opinion, that the same should be overruled. "If an agent, employed to purchase for another, purchases for himself, he will be considered the trustee of his employer."—See Lees v. Nuttall, 1 Russ. & My. 53; Taylor v. Salmon, 4 Myl. & Craig, 134, 139; Perkins v. Alexander, 1 Johns. Ch. 394.

There is a class of cases, where the right to real estate is in controversy, which hold that, when the agency relied on is in parol, and the agent, in disregard of his agreement, makes the purchase on his own account, the principal cannot have the agent declared his trustee.—See Bartlett v. Pickergill, 1 Eden, 515; 2 Sug. on Ven. 138, bottom page; Lenian v. Whitley, 4 Russ. 423. In these

cases, however, relief is denied, because there is no agreement or memorandum in writing to take the case out of the statute of frauds. They can have no application to personal property; and hence we need not announce our concurrence with, or dissent from, the principles announced in the cases cited *supra.*